**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **ALONZA BAKER, JR.,** *et al.*, | : | |
| **Plaintiffs,** | : | **CIVIL ACTION** |
| | : | |
| | : | |
| **v.** | : | |
| | : | |
| **CITY OF PHILADELPHIA,** *et al.*, | : | |
| **Defendants.** | : | **NO. 05-1562** |
| | : | |

**<u>MEMORANDUM</u>**

Schiller, J.                                                                                   October 26, 2009

Plaintiffs Alonza Baker, Jr., Gregory K. Jenkins, Roderick K. Washington, John H. McNeil, Jr., and Ernest L. Greenwood, Jr. initiated a lawsuit against the City of Philadelphia ("City"), the City of Philadelphia Commission on Human Relations ("Commission") and Rachel Lawton, acting Executive Director of the Commission, alleging various violations of 42 U.S.C. § 1983, 42 U.S.C. §§ 2000e–2000e-17 ("Title VII") and the First Amendment to the United States Constitution. Before the court are five motions for summary judgment—one for each plaintiff in this case—filed by the Defendants. For the reasons that follow, Defendants' motions will be granted.

## I.   PROCEDURAL HISTORY

On April 6, 2005, Jenkins, McNeil, Baker, Washington, and Greenwood filed their original Complaint against the City, the Commission, and Lawton. The Complaint asserted the following claims against all Defendants: race discrimination and a racially hostile work environment brought by all Plaintiffs; a Title VII race discrimination claim brought by Jenkins; a Title VII retaliation

1

claim brought by Jenkins; and a First Amendment retaliation claim brought by Jenkins and Washington under 42 U.S.C. § 1983.

On June 28, 2005, Plaintiffs filed an Amended Complaint, which replaced the section 1981 claim with an identical claim premised on section 1983. On July 18, 2005, Defendants moved to dismiss the Title VII claims brought by Jenkins. On September 14, 2005, Judge Buckwalter, the then-presiding judge, granted Defendants' motion and dismissed Jenkins's Title VII claims because Jenkins failed to file a timely charge of discrimination with the Equal Employment Opportunity Commission ("EEOC") per 42 U.S.C. § 2000e-5(e)(1).

Plaintiffs filed a Second Amended Complaint on June 2, 2006. This Complaint made the following claims: a section 1983 race discrimination and racially hostile work environment claim against the City and the Commission brought by all Plaintiffs; Title VII race discrimination and retaliation claims against the City and the Commission brought by Jenkins, Washington, Greenwood, and Baker; and a First Amendment retaliation claim against Lawton brought by Jenkins and Washington under section 1983.

Plaintiffs' claims against the Commission were dismissed on June 15, 2009 because the Commission is a department of the City and not a separate legal entity that can be sued directly. *See* 53 Pa. Cons. Stat. § 16257.


II.    **STANDARD OF REVIEW**

Summary judgment is appropriate when the admissible evidence fails to demonstrate a dispute of material fact and the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(c); *Anderson v. Liberty Lobby*, *Inc.*, 477 U.S. 242, 247–48 (1986). When the moving party

does not bear the burden of persuasion at trial, the moving party may meet its burden on summary judgment by showing that the nonmoving party's evidence is insufficient to carry its burden of persuasion at trial.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986).  Thereafter, the nonmoving party demonstrates a genuine issue of material fact if sufficient evidence is provided to allow a reasonable jury to find for it at trial.  *Anderson*, 477 U.S. at 248.  In reviewing the record, "a court must view the facts in the light most favorable to the nonmoving party and draw all inferences in that party's favor."  *Armbruster v. Unisys Corp.*, 32 F.3d 768, 777 (3d Cir. 1994).  Furthermore, a court may not make credibility determinations or weigh the evidence in making its determination.  *See Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000); *see also Goodman v. Pa. Tpk. Comm'n*, 293 F.3d 655, 665 (3d Cir. 2002).

## III.    FACTS AND DISCUSSION

### A.    Gregory K. Jenkins

#### 1. Facts

On April 8, 2002, the Commission hired Jenkins, an African-American male, as a Human Relations Representative ("HR Rep") Level I in the Compliance Division  (Sec. Am. Compl. ¶ 29; Defs.' Mot. for Summ. J. as to Jenkins, Ex. A [Deposition of Gregory K. Jenkins] at 20–21.)  His supervisor at the time was Joseph Farley, who is a white male.  (*Id.* at 20–21.)    Farley supervised five employees:  Jenkins, Matthew Cowell (a white male), Deborah Rudbarg (a white female), Bernard Bivens (an African-American male) and Paulette Banks (an African-American female).  (*Id.* at 54.)

After Jenkins completed an initial six month probationary period, he felt that Farley began

treating him more harshly than his white colleagues.  (*Id.* at 49.)  For example, Farley closely

monitored Jenkins's breaks, seeking out Jenkins if Farley thought Jenkins had not returned to work

promptly, whereas Cowell and Rudbarg were not scrutinized in their comings and goings.  (*Id.* at

49–51.)  According to Jenkins, Farley did not scrutinize the other black employees' whereabouts

because they did not take many breaks.  (*Id.*)

Farley also had other HR Reps sit in on Jenkins' fact-finding conferences, but did not take

such action with other HR Reps.  (*Id.* at 59–61.)  Farley required Jenkins to meet with him every

week to provide a case report, whereas Farley did not require this of any other HR Rep.  (*Id.* at 64.)

Farley explained that this weekly report was required by Lawton, who was the Commission's

Director of Compliance at the time.  (*Id.* at 65.)  Jenkins complained to Lawton about the way Farley

treated him, after which Farley's scrutiny of Jenkins intensified.  (*Id.* at 95–96.)  After Jenkins's

discussion with Lawton, Farley forbade Jenkins from speaking with individuals whose cases the

Commission was investigating without first speaking with Farley.  (*Id.* at 97.)

On May 30, 2003, Jenkins filed a charge of discrimination with the EEOC, alleging that the

above-described treatment amounted to racial discrimination.  (Defs.' Mot. for Summ. J. as to

Jenkins, Ex. E [EEOC charge dated May 30, 2003].)  Following this EEOC charge, Farley's

differential treatment of Jenkins intensified.  (Jenkins Dep. at 101–04.)  At around the time that he

filed his EEOC charge, Jenkins spoke out about what he perceived to be racially discriminatory

conduct by the Commission at a meeting in which Lawton and Farley were in attendance.  (*Id.* at

153–55.)[1]

---

[1] Jenkins claims that he also spoke out about racial discrimination taking place within the
Commission at another staff meeting, but cannot remember when that meeting took place or the
exact comments he made.  (Jenkins Dep. at 155–56.)

4

In August of 2003, Jenkins received an overall evaluation of "improvement needed" from Farley. (Defs.' Mot. for Summ. J. as to Jenkins, Ex. B [Jenkins 2003 evaluation].) The report raised issues with the accuracy of Jenkins's reports, his ability to follow instructions, the quantity of work he was producing, his energy, and his focus. (*Id.*) The report also alluded to warnings Jenkins received about "time issues" and to a suspension in May of 2003 "for issues regarding falsification of documents, dishonesty, time issues and insubordination." (*Id.*)

In October of 2003, Denise Benrahou, an African-American female, transferred into Jenkins's department. (Jenkins Dep. at 121.) According to Jenkins, Benrahou is "fair skinned, [she] almost looks Caucasian." (*Id.* at 122.) Benrahou did not have to meet with her supervisors as regularly, have other HR Reps sit in on her fact finding sessions nor be supervised during her field investigations. (*Id.* at 122, 124–25.)

In September of 2003, Farley became Acting Compliance Director and Jenkins began working under the rotating supervision of Acting Supervisors Rosemary Branigan, a white female, and Paulette Banks, an African-American female. (*Id.* at 108–09; Sec. Am. Compl. ¶ 39.) On February 6, 2004, Jenkins emailed Branigan and Banks, as well as Jackie Henry, the Commission's Director of Administration, asking for a reevaluation in light of the negative evaluation he received in August. (Defs.' Mot. for Summ. J. as to Jenkins, Ex. C [Reevaluation request]; Jenkins Dep. at 116–17.) According to Jenkins, his request was denied by Farley and Lawton, who was by this time the Acting Executive Director of the Commission. (*Id.* at 118–19.) This prevented him from receiving an incremental pay raise of approximately $3000 to which he would otherwise be entitled and also from obtaining a transfer. (*Id.*)

In July of 2004, Jenkins received an overall rating of satisfactory in his annual evaluation

5

from Banks. (Defs.' Mot. for Summ. J. as to Jenkins, Ex. D [Jenkins 2004 evaluation]; Jenkins Dep. at 133.) The evaluation noted that Jenkins had improved in several areas but that he still needed improvement in "writing investigative plans, composing interview questions, and reviewing plans with [his] Supervisor/Director prior to making field visits." (Jenkins 2004 evaluation.) Jenkins states that the negative portion of his evaluation was inserted because the reviewing officer on the evaluation was Farley. (Jenkins Dep. at 135.) He bases this contention on his interactions with Banks. (*Id.* at 136.)

In February of 2005, Jenkins received notice that he was being laid off. (Defs.' Mot. for Summ. J. as to Jenkins, Ex. G1-G2 [Jenkins Interrogs.] at No. 5.) To his knowledge, other Commission employees were also laid off, with the decision having been made based on years of service, military status, and performance evaluations (Jenkins Dep. at 131–32.)

### 2. Legal Analysis

#### a. Jenkins's Title VII claims

As Defendants point out, Jenkins's Title VII claims are identical to the claims that were previously dismissed by Judge Buckwalter's September 14, 2005 memorandum. *Compare* First Am. Compl. ¶¶ 29–49, 108–11 *with* Second Am. Compl. ¶¶ 29–49, 108–11. These claims are *res judicata* and cannot be revived merely because the case is before a different judge.

#### b. Jenkins's First Amendment retaliation claim

To hold an individual personally liable[2] under section 1983, the plaintiff must allege that the

---

[2] The complaint does not make clear whether Lawton has been sued in her official or personal capacity on the First Amendment claim. Official capacity suits "generally represent only another way of pleading an action against an entity of which an officer is an agent." *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690 n.55 (1978). "As long as the government entity receives notice and an opportunity to respond, an official-capacity suit is, in all respects other

individual defendant had "personal involvement in the alleged wrongs." *Rode v. Dellarciprete*, 845 F.2d 1195, 1207 (3d Cir. 1988). Personal involvement can be shown through evidence that the defendant personally directed others to carry out the unlawful act or that the individual defendant knew of the unlawful conduct and acquiesced in it. *Id.* In this case, Defendants argue that Jenkins cannot point to any evidence that Lawton was personally responsible for any retaliatory conduct directed against him. The negative performance evaluation was drafted by Farley. (Jenkins Dep. at 114–15.) Jenkins's email requesting a reevaluation was sent to Branigan, Henry, and Banks. (Reevaluation request; Jenkins Dep. at 116–17.) The only connection Jenkins makes between Lawton and the adverse employment actions he allegedly experienced is a conclusory allegation that she was behind the decision to deny him a reevaluation. This unsubstantiated claim, made without any direct personal knowledge, is insufficient to withstand summary judgment. *See Blair v. Scott Specialty Gases*, 283 F.3d 595, 608 (3d Cir. 2002) ("In order to satisfy the standard for summary judgment the affiant must ordinarily set forth facts, rather than opinions or conclusions. An affidavit that is essentially conclusory and lacking in specific facts is inadequate to satisfy the movant [or non-movant]'s burden." (citing *Maldonado v. Ramirez,* 757 F.2d 48, 51 (3d Cir. 1985) (quotation marks omitted) (alteration in original)). Therefore, Jenkins has failed to produce sufficient evidence such that a reasonable jury could find for him on his First Amendment claim against Lawton.

_____

than name, to be treated as a suit against the entity." *Ky. v. Graham*, 473 U.S. 159, 166 (1985). Therefore, to the extent that Lawton was sued in her official capacity, that claim must fail because, as discussed *infra*, Plaintiffs have not shown the existence of a policy or custom sufficient to impose liability on the City.

**B.      Roderick K. Washington**

*1. Facts*

Washington was hired by the Commission as an HR Rep Level I on April 8, 2001.  He was promoted to the position of HR Rep Level II on April 8, 2002 in the Compliance Division.  (Defs.' Mot. for Summ. J. as to Washington, Ex. B [Deposition of Roderick K. Washington] at 39–40.) Plaintiff's supervisor was Wilma Holmes, an African-American female.  (*Id.* at 41.)

In the spring of 2004, Washington met an attorney who suggested that a training workshop she conducted would be appropriate for Commission employees.  (*Id.* at 42; Defs.' Mot. for Summ. J. as to Washington, Ex. A1-A2 [Washington Interrogs.] at No. 9.)   Washington requested permission to sit in on this workshop to see if it would be the kind of training from which Commission employees could benefit, but no action was taken upon his request.  (Washington Dep. at 42.)   Approximately one month later, Rosemary Branigan, a white female employee, told Washington that she attended the training and thought it was appropriate for the agency.  (*Id.* at 46.) When Washington asked Holmes why he had not received permission to attend the training, Holmes indicated that Lawton decided the training was untimely and too expensive.  (*Id.* at 47, 55.) Washington believes that his race was a factor in this decision because, as he puts it, "I found that training, I made the connection with the attorney, and I was totally eliminated from the decision making process and a white female was selected to monitor that training in place of me." (*Id.* at 49–50.)

On or about November 11, 2004, Lawton chaired a general Commission staff meeting which Washington attended.  (*Id.* at 55.)  The topics discussed at the meeting included ways in which the Commission could improve its performance.  (*Id.* at 58.)   During this meeting, Washington

suggested that Commission employees receive more training, that employees in different divisions be trained in the work of other divisions, and that employees be treated with more respect. (*Id.* at 62.) Washington was trying to improve the Commission and boost morale, which he suggested was very low. (*Id.* at 63.) Lawton responded by telling Washington in front of the other Commission employees that he lacked sufficient information about the Commission to make such assessments. (*Id.* at 65.)

Washington claims that after this meeting he was treated differently. (*Id.* at 64.) Holmes indicated to Washington "that it's not typical of people at the Commission to express opinions or ideas" and that his statements "caught people off guard." (*Id.* at 69.) She also informed Washington that Lawton found his suggestions arrogant and insubordinate. (*Id.* at 68–69.) Washington met with Lawton in her office, at which time Lawton demanded an apology. (*Id.* at 70–72.) Washington did not apologize, but instead expressed to Lawton that his suggestions were constructive and not criticisms. (*Id.* at 71.)

Later that day, Washington informed Holmes and Jackie Henry of his discussion with Lawton. (*Id.* at 72.) Henry responded that it was appropriate for Washington to advise her of department issues that concerned employees and that she encouraged this practice. (*Id.* at 72–73.) According to Washington, Commission employee Matt Cowell told Washington that after Cowell spoke out to Lawton about his work that it was much more difficult for him to close out cases. (*Id.* at 109.)

On or about February 8, 2005, an irate complainant called Washington's supervisor, Holmes, and argued with her about his complaint. (*Id.* at 74–75.) Holmes instructed Washington to speak with this complainant. (*Id.* at 75.) The caller verbally abused and threatened Washington, at which

time Washington told the caller that he would terminate the call if this conduct continued.  (*Id.*)

When the complainant's conduct continued, Washington looked to Holmes for direction.  (*Id.*)  She

agreed with him that the proper course was to hang up the phone, which Washington did.  (*Id.*)

On or about February 9, 2005, Washington received an e-mail from Joseph Farley, the

Deputy Director, stating that Washington and Holmes should be careful how they speak with

complainants, referencing the above-described hostile conversation.  (*Id.* at 76; Defs.' Mot. for

Summ. J. as to Washington, Ex. C [Farley-Washington emails].)  Washington responded to Farley's

e-mail and expressed resentment that Farley reached a conclusion about his conversation with a

complainant without first speaking to Washington.  (Farley-Washington emails.)  A few days later,

Washington was verbally counseled about his e-mail response by Holmes and Greenwood at

Lawton's direction.  (Washington Dep. at 76–77.)

Washington also states that his supervisor, Holmes, would constantly return his work to him,

saying that he needed to make changes to satisfy Lawton's preferred writing style.  (*Id.* at 83, 85.)

He claims that similarly situated white colleagues like Rosemary Branigan and Deborah Rudbarg

received better treatment.  (*Id.* at 84.)

Washington also states that his comings and goings were scrutinized more closely than those

of white colleagues Branigan, Rudbarg, and Cowell.  (*Id.* at 91–92.)  According to Washington,

Farley would "constantly walk by [Washington's desk] and he would say it's a management style

where the manager would constantly look over the employee's shoulder in order to make them

perform better and I was uncomfortable with that because it was constant."  (*Id.* at 92–93.)  He

further states that he felt continuous pressure to "get [his] numbers up" and maintain rates of case

closures comparable to his colleagues.  (*Id.* at 96–97.)

Washington also once suggested that the movie "Crash" be shown to all agency employees, since the film dealt with race relations issues that he felt would educate Commission staff.  (*Id.* at 101–02.)  This request was not acted upon until a year later, when Farley sent an email out to the staff that the movie was available in the office for viewing.  (*Id.* at 103–04.)

### 2. Legal Analysis

#### a. Washington's First Amendment claim

As the Supreme Court has noted, "the First Amendment protects a public employee's right, in certain circumstances, to speak as a citizen addressing matters of public concern." *Garcetti v. Ceballos*, 547 U.S. 410, 417 (2006).  A state entity "cannot condition public employment on a basis that infringes the employee's constitutionally protected interest in freedom of expression." *Connick v. Myers*, 461 U.S. 138, 142 (1983).  A public employer "adversely affects an employee's First Amendment rights when it . . . makes decisions, which relate to promotion, transfer, recall and hiring, based on the exercise of an employee's First Amendment rights." *Brennan v. Norton*, 350 F.3d 399, 419 (3d Cir. 2003).

For a public employee to prevail on a claim that he was retaliated against for exercising First Amendment rights, he must show:  (1) that he engaged in activity protected by the First Amendment; (2) that defendants' retaliatory action was sufficient to deter a person of ordinary firmness from exercising his or her rights; and (3) that there was a causal connection between the protected activity and the retaliatory action.  *Lauren W. v. DeFlaminis*, 480 F.3d 259, 267 (3d Cir. 2007).  "[T]he employer may defeat the employee's claim by demonstrating that the same adverse action would have taken place in the absence of the protected conduct."  *Hill v. City of Scranton*, 411 F.3d 118, 125 (3d Cir. 2005).

11

Whether the speech was protected by the First Amendment is a question of law.  *See Azzaro v. County of Allegheny*, 110 F.3d 968, 975 (3d Cir. 1997) (en banc).  In determining whether a plaintiff's speech or conduct is protected by the First Amendment, a district court must assess (1) whether the employee spoke as a citizen on a matter of public concern, and, if so, (2) whether those speech restrictions "are necessary for [the government employer] to operate efficiently and effectively."  *Garcetti*, 547 U.S. at 419.

Washington claims that the following speech was protected:  (1) his suggestions at the November 11, 2004 staff meeting that the Commission should offer more training to employees and (2) his suggestion that the Commission show the film "Crash" to employees.  (Washington Dep. at 101.)  These comments were made by Washington in his capacity as an employee and not as a private citizen.  *See Garcetti*, 547 U.S. at 418–19.  Washington admits that the purpose of the staff meeting was "to discuss . . . plans for the agency moving forward" and that his goal in making the suggestions was to improve staff morale.  (Washington Dep. at 55, 63.)  Washington was in the meeting because of his position as an agency employee and he made the suggestions because he felt that they would improve the Commission's ability to do its work.  Similarly, his suggestion that employees view the film "Crash" was meant to benefit the Commission and educate its employees, not to address an issue of public concern.  Therefore, Washington was not speaking as a citizen on a matter of public concern and his First Amendment retaliation claim fails.

### b. Washington's Title VII race discrimination claim

Washington claims that he was discriminated against on the basis of his race, in violation of Title VII.  The burden of proof in Title VII race discrimination cases is governed by the framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).  To avoid summary judgment,

the plaintiff must first make out a *prima facie* case of discrimination by demonstrating that: (1) he belongs to a protected class; (2) he was qualified for the position; (3) he was subject to an adverse employment action despite being qualified; and (4) this occurred under circumstances that raise an inference of discriminatory action, such as when a similarly situated person not of the protected class is treated more favorably. *See Sarullo v. U.S. Postal Serv.*, 352 F.3d 789, 797 (3d Cir. 2003). If the plaintiff meets this test, the burden of production shifts to the employer to show a legitimate, non-discriminatory reason for the adverse employment decision. *Moore v. City of Phila.*, 461 F.3d 331, 342 (3d Cir. 2006). If the defendant satisfies this burden, the plaintiff must then produce some evidence from which a jury could reasonably find that the employer's proffered explanation for taking the action was false, and that discrimination was the real reason for the adverse employment action. *Id.*

Washington's Title VII discrimination claim fails because he did not suffer an adverse employment action. An adverse employment action is something "serious and tangible enough to alter an employee's compensation, terms, conditions, or privileges of employment." *Robinson v. City of Pittsburgh,* 120 F.3d 1286, 1300 (3d Cir. 1997) . The mere fact that the employee "generally finds [the conduct] objectionable" is not sufficient. *Nelson v. Upsala Coll.*, 51 F.3d 383, 388 (3d Cir. 1995). The conduct of which Washington complains—not being given permission to review a training program, having his breaks monitored, being asked to apologize to Lawton, being asked to speak more politely with complainants, being criticized for his work and pressured to close his cases—does not constitute  adverse employment action.

Furthermore, no reasonable jury could find that the conduct to which Washington was subjected was the result of racial discrimination. Washington complains that his supervisor

scrutinized his work excessively, but his then-supervisor (Holmes) is African-American.  He also admits that the scrutiny was designed to conform Washington's work to Lawton's preferred writing style.  (Washington Dep. at 83–85.)  There is no evidence that Lawton developed this preferred writing style out of racial animus.  He complains that he was treated differently after he "spoke up" at a staff meeting to Lawton, yet he admits that Matt Cowell, a white employee, also received greater scrutiny from Lawton after "speaking out" to her and that it was not part of the culture of the Commission to express opinions or ideas to Lawton.  (*Id.* at 109, 69.)  Washington complains that Farley looked over his shoulder and hovered over him while he tried to work, yet admits that this was Farley's management style.  (Washington Dep. at 92–93.)  Washington's qualms with Lawton and Farley's management style do not amount to a Title VII violation.

### c. Washington's Title VII retaliation claim

To establish a *prima facie* case of retaliation, "a plaintiff must show that: (1) the employee engaged in a protected employee activity; (2) the employer took an adverse employment action after or contemporaneous with the employee's protected activity; and (3) a causal link exists between the employee's protected activity and the employer's adverse action."  *Farrell v. Planters Lifesavers Co.*, 206 F.3d 271, 279 (3d Cir. 2000).

Washington's retaliation claims fail for two reasons.  First, he fails to identify any protected conduct on his part.  As described *supra*, Washington's comments at the November 11, 2004 staff meeting and his suggestion that the Commission show the film "Crash" were made in his capacity as an employee and not as a private citizen.  He does not allege that the conduct to which he was subjected was the result of him filing a charge with the EEOC, participating in an investigation of discrimination, or even complaining to management about perceived discrimination. *See Robinson,*

14

120 F.3d at 1299 (filing charges with the EEOC is protected activity); *Glanzman v. Metro. Mgmt. Corp.,* 391 F.3d 506 (3d Cir. 2004) (participating in discrimination investigation is protected activity); *Barber v. CSX Distrib. Servs.*, 68 F.3d 694, 701–02 (3d Cir. 1995) (finding complaints to management about conduct that can reasonably be construed as discriminatory is protected activity). Rather, he spoke about training issues at the Commission.  This is not a protected employee activity.

Second, the conduct Washington faced does not qualify as an adverse action.  A cause of action for retaliation under Title VII lies whenever the employer responds to protected activity in such a way "that a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Burlington N. & Santa Fe Ry. Co. v. White,* 548 U.S. 53, 68 (2006) (citations and quotation marks omitted).  The conduct of which Washington complains—being asked to apologize to Lawton, having his work scrutinized, receiving a verbal reprimand for the tone he took with a caller, not being allowed to review a training session—essentially amounts to scolding, and the Court finds as a matter of law that it would not dissuade a person of reasonable fortitude from making a charge of discrimination.

**C.     Ernest L. Greenwood, Jr.**

*1. Facts*

In September 1999, Greenwood began working for the Commission in the position of HR Rep Level I in the Compliance division.  (Sec. Am. Compl. ¶ 82; Defs.' Mot. for Summ. J. as to Greenwood, Ex. A [Deposition of Ernest L. Greenwood, Jr.] at 25–26.)  In September of 2000, Greenwood was promoted to HR Rep Level II.  (*Id.* at 35–36.)  In September of 2001, Greenwood was promoted to Deputy Director of Community Relations, after applying and taking the civil

service promotional examination for that position. (*Id.* at 34–36.) As Deputy Director, Greenwood met with local politicians and community leaders to promote the Commission's mission of solving racial problems. (*Id.* at 10.) Greenwood's duties also included managing one supervisor and seven HR Reps. (*Id.* at 10.)

The Commission maintains Rumor Central, a hotline for major events or emergency situations to answer questions from the public and prevent the spread of false rumors. (*Id.* at 84.) In late 2003, Greenwood answered a call on the hotline phone at his desk. (Greenwood Dep. at 85–87.) The unidentified caller asked general questions about the hotline, which Greenwood answered. (*Id.* at 86, 90, 92.) The caller turned out to be a reporter, and shortly thereafter, an article appeared in the Philadelphia Weekly, in which Greenwood is quoted as saying that the hotline is "not like Get Smart" and that many of the calls to the hotline are really just "all kinds of silliness." (Defs.' Mot. for Summ. J. as to Greenwood, Ex. B [Philadelphia Weekly Article].) Greenwood testified that the reporter misquoted him and that he did not make any of those comments. (Greenwood Dep. at 89–90.)

According to Greenwood, the reporter wrote "something that was basically funny," but that then-Acting Executive Director Lawton "felt like it was an embarrassment." (*Id.* at 87.) After Greenwood met with Lawton and Jackie Henry to discuss the Philadelphia Weekly article, he received a written warning. (Greenwood Dep. at 91–92; Defs.' Mot. for Summ. J. as to Greenwood, Ex. C [Memo. from Lawton to Greenwood dated Jan. 12, 2004].) According to Greenwood, Lawton gave him the written warning because she "erroneously" believed he had made the "embarrass[ing]" statements. (Greenwood Dep. at 87–88.) Greenwood also alleges that he received the written warning because of his race. (*Id.* at 88.) Greenwood bases this contention on the fact that the

16

warning was "[v]ery consistent with [Lawton's] behavior the whole time" she was Acting Executive Director.  (*Id.* at 88.)  Furthermore, he points to the fact that Farley once was quoted in the Daily Pennsylvanian discussing the Rumor Hotline.  (Greenwood's Br. in Resp. to Defs.' Mot. for Summ. J., Ex. C [*Daily Pennsylvanian* Article Dated 9/13/90].)

At the time he received the written warning, Greenwood was seeking consideration for the position of permanent Executive Director.  (Defs.' Mot. for Summ. J. as to Greenwood, Ex. D [Memo. from Greenwood to Lawton dated Jan. 29, 2004].)  Greenwood assumed that Lawton knew he was seeking such consideration.  (Greenwood Dep. at 93.)  Greenwood alleges that the written warning "calls into question" whether he will ever be Executive Director.  (*Id.* at 66, 94.)  Greenwood bases this contention on Lawton's "consistent behavior" and his belief that Lawton passed on "derogatory" information about him to Reverend James Allen, then-Chair of the Commission, who recommended to the Mayor a successor Executive Director.  (*Id.* at 94.)  Ultimately, Nick Taliaferro succeeded Lawton as Executive Director.  (*Id.* at 19.)

In March of 2004, the City undertook a City-wide reduction in its fleet of vehicles.  (Greenwood Dep. at 70–71; Defs.' Mot. for Summ. J, Ex. E [Memo. from Goldsmith & Davis dated Mar. 2, 2004 re: City-wide Fleet Reduction Project].)  Before the reduction, Community Relations had four cars at its disposal in its field office, including one that was dedicated for Greenwood's use.  (Greenwood Dep. at 71.)  After the reduction, the fleet was reduced to one.  (*Id.* at 70.)  According to Greenwood, "other department heads . . . did not give up one vehicle, even though they had maybe twice as many as [the Commission] did.  And their use was much more frivolous than our use of the vehicles." (*Id.*)  Greenwood also complains that "there were many statements written about why people needed their cars" and "[t]here was no attempt made on the part of our . . . department to do

17

that." (*Id.* at 71.) However, Greenwood admits that Lawton made a written request to the managing director of the City to keep one of the City vehicles and that the decision ultimately belonged to the managing director. (*Id.* at 71–72.) Greenwood believes that it was "not a good move" on Lawton's part to fail to advocate more strongly for the Commission to keep more vehicles. (*Id.* at 72.) Greenwood alleges that, because of his race, Lawton made the request to keep one car, but not four. (*Id.* at 72–73.)

Greenwood further claims that, because of his race, Lawton did not meet with him in her first six to eight weeks as Acting Executive Director although she met with Greenwood's immediate subordinate Gael Mahan, a white woman, and with Farley, a white male. (*Id.* at 36, 40–42, 54–55.) Greenwood did not request a meeting with Lawton during those six to eight weeks because he was "met with hostility" every time he talked with her and he "just didn't feel like being bothered." (*Id.* at 40, 54–55.) Greenwood states that Lawton "didn't have any problem meeting with Joe [Farley] or anybody else in the agency" and that she "[j]ust seemed to have a problem with" him. (*Id.* at 54.) Greenwood eventually met with Lawton after her first six to eight weeks in the position of Acting Executive Director. (Greenwood Dep. at 44.)

Greenwood claims that, because of his race, Lawton bypassed him and met with his subordinates. (Sec. Am. Compl. ¶ 84; Defs.' Mot. for Summ. J as to Greenwood, Ex. F1–F2 [Greenwood Interrogs.] at No. 1.) At one time, Greenwood assigned Mahan to work exclusively for the Community Relations Division, but Lawton returned Mahan to her old position, saying that Greenwood did not have authority to make such a decision. (Greenwood Dep. at 47–48.) In addition, Lawton reassigned a secretary that used to work in his division and never assigned a replacement. (*Id.* at 57–58.) On or about March of 2005, Lawton had one of Greenwood's

18

subordinates, Wutha Chin (an Asian-American male), present information about Greenwood's division to the Commissioners. (*Id.* at 108–09.) Greenwood felt slighted because he was Chin's supervisor and could have given the presentation. (*Id.* at 63, 108.) He found the experience humiliating and believed it was designed to embarrass him. (*Id.* at 63, 108.) He claims that Farley was never subjected to such treatment. (*Id.* at 64.)

Greenwood also claims that Lawton singled him out for criticism. He stated that on one occasion, Lawton went out of her way to prove that he was wrong about how cases came to the Commission. (*Id.* at 64–65.) Greenwood testified in his deposition that Lawton "on several occasions" would "say things" in his Community Relations staff meetings that she insisted on attending. (*Id.* at 66.) Greenwood testified in his deposition that Lawton made "direct jabs" on his management style at his staff meetings and that "people commented on it afterwards." (*Id.* at 67.) Greenwood contends Lawton made these comments because of his race based on the fact that he did not "recall her ever doing anything like that to anybody else in the agency," particularly not to Farley. (*Id.*)

Greenwood claims that although his job description requires him to speak with public officials, Lawton prohibited him from doing so without her permission. (Greenwood Interrogs. at No. 2; Greenwood Dep. at 17.) Greenwood bases this allegation on Lawton's "consistent behavior" and the fact that he could not "ever remember Joe [Farley] complaining about being forbidden to speak to anybody." (*Id.* at 74.)

Greenwood also alleges that, because of his race, Lawton belittled his management style in front of other employees. (*Id.* at 76–78.) At one point, Lawton spoke with Greenwood's staff without Greenwood present. Several members of his staff reported to him that "Rachel was gunning

for you." (*Id.* at 77.)  Greenwood also claims that in this particular meeting, Lawton was trying to

"find dirt" on him.  (*Id.* at 117–18; Greenwood Interrogs. at No. 2.)

Greenwood alleges that Lawton circumvented a chain of command policy that she had

implemented and talked to his staff members about their work instead of asking him.  (Greenwood

Dep. at 80–81.) Greenwood alleges that this was racially motivated because it was "[v]ery consistent

with the rest of [Lawton's] behavior" and because he "can't think of any . . . reason" other than race.

(*Id.* at 81.)

Greenwood alleges that, because of his race, Lawton failed to leave him "in charge" of the

Commission during her various absences and instead delegated her Executive Director duties to

Farley.  (*Id.* at 102–05.)  Once, a co-worker said to Greenwood, "Ask Joe, he's in charge."  (*Id.* at

105.)  Based upon this, he claims that Farley was in fact left in charge by Lawton and that this was

done because of race.  (*Id.* at 102–05.)  Finally, Greenwood alleges that, because of his race, Lawton

excluded him from a March 2005 meeting about a Community Relations issue with three community

leaders and instead invited Patricia Coyne, one of his subordinates, to attend.  (*Id.* at 105–06.)

2. *Legal Analysis*

a. *Greenwood's Title VII race discrimination claim*

Greenwood claims that he was discriminated against on the basis of his race, in violation of

Title VII.  Again, the appropriate framework to review this claim comes from *McDonnell Douglas*,

411 U.S. 792 (1973).  Defendants do not dispute that Greenwood is in a class protected by Title VII,

nor that he is qualified, but instead argue that summary judgment is appropriate here because "there

is no evidence that race played any role in Greenwood's treatment, and . . . because Greenwood

cannot establish that he suffered an adverse employment action."  (Defs.' Br. in Supp. of Mot. for

Summ. J. as to Greenwood at 20.)  The Court agrees.

Most of the incidents Greenwood points to do not implicate race in any way, and those for which Greenwood suggests that he was treated differently than white employees fail to present a genuine issue for the finder of fact.  The reduction in the number of City automobiles affected the entire Commission (in fact, the entire City) and the record shows that Lawton tried to preserve a City vehicle for the Commission.  (Greenwood Dep. at 71.)  As to Greenwood's claims that Lawton undermined his authority and looked to his subordinates instead of him, the only connection he makes between those allegations and race is his conclusory assertion that they were race-based.  "[A] plaintiff cannot rely on unsupported assertions, speculation, or conclusory allegations to avoid a motion for summary judgment."  *Solomon v. Soc'y of Auto. Eng'rs*, 41 F. App'x 585, 586 (3d Cir. 2002).  The Philadelphia Weekly article incident involved an employee disciplined for violating a workplace rule regarding Commission employees' discussions with the media.  (Greenwood Dep. at 87–88; Greenwood's Statement of Undisputed or Disputed Material Facts and Br. in Resp. to Defs.' Mot. for Summ. J., Ex. D [Media Policy Email] (noting Commission policy that employees are not to speak to the media about their job at the Commission without prior approval and discussion with the Executive Director).)  Greenwood's only connection between the Philadelphia Weekly article incident and race is his assertion that Farley spoke to a reporter about the Rumor Hotline in 1990.  Greenwood does not even present evidence on whether Farley was disciplined for this incident, and the only suggestion he makes that the media policy was even in place in 1990 is a 2003 email in which Lawton refers to the policy as "long standing."  (Media Policy Email.) Greenwood claims that Lawton met with Farley but not him in Lawton's first several weeks as Executive Director, but he admits that he did not request a meeting with Lawton and that she "didn't

have any problem meeting with . . . anybody else in the agency" and that she "[j]ust seemed to have a problem with me." (Greenwood Dep. at 54.) And while Greenwood complains that Lawton would not let him speak to public officials, his only point of comparison is that he never heard Farley complain about being similarly forbidden. (Greenwood Dep. at 74.) The Court is of course conscious that "discrimination analysis must concentrate not on individual incidents, but on the overall scenario." *Durham Life Ins. Co. v. Evans*, 166 F.3d 139, 149 (3d Cir. 1999). In this case, the Court finds that the acts that Greenwood points to, when viewed as a whole, fail to suggest that race played a role in the treatment he received.

Furthermore, Greenwood cannot demonstrate that he suffered an adverse employment action. Greenwood cites to Third Circuit language that "[i]f an employer's act substantially decreases an employee's earning potential and causes significant disruption in his or her working conditions, a tangible adverse employment action may be found." *Durham*, 166 F.3d at 153. The plaintiff in *Durham*, aside from being subject to overt sexual advances and unwanted touching, was assigned less lucrative work than male colleagues, had her office and secretary removed despite being promised such amenities when recruited, and had cash and files necessary to do her job stolen from her at work. *Id.* at 145–46. Those actions, in sum, were sufficient to constitute an adverse employment action. Greenwood's efforts to compare his treatment to that received by the plaintiff in *Durham* are unavailing. Unlike the *Durham* plaintiff, the record lacks evidence that Greenwood needed a secretary to carry out his job duties, nor was he promised one when he joined the Commission, as the *Durham* plaintiff had been. The same is true with respect to the City automobile to which Greenwood once had access. And though requiring Greenwood to get Lawton's permission before speaking to public officials was an inconvenience, Title VII addresses only adverse

employment actions, not "conduct in general which the . . . employee finds objectionable." *Nelson*, 51 F.3d at 388.  Nor is the fact that Greenwood was not promoted to Executive Director dispositive, as he has presented no evidence regarding his qualifications for the position or even the race of the person to whom the position was awarded.  *See Sherrod v. Phila. Gas Works*, 209 F. Supp. 2d 443, 450 (E.D. Pa. 2002) (noting that plaintiff in failure to promote case must present evidence of his qualification for the position sought).

*b. Greenwood's Title VII retaliation claim*

To establish a *prima facie* case of retaliation, "a plaintiff must show that: (1) the employee engaged in a protected employee activity; (2) the employer took an adverse employment action after or contemporaneous with the employee's protected activity; and (3) a causal link exists between the employee's protected activity and the employer's adverse action." *Farrell*, 206 F.3d at 279.  The only arguably protected activity Greenwood engaged in—filing this lawsuit—occurred after the treatment of which he complains and therefore does not support a retaliation claim.  Therefore, Defendants' motion for summary judgment will be granted as to Greenwood's retaliation claim.

**D.   Alonza Baker, Jr.**

*1. Facts*

Baker, an African-American male, began working for the Commission in or around August of 1987 as an HR Rep Level I.  (Defs.' Mot. for Summ. J. as to Baker, Ex. A [Deposition of Alonza Baker, Jr.] at 9, 14.)  Eventually, he became the Commission's Local Area Network ("LAN") administrator.  (*Id.* at 23–24, 30–31.)  He was later promoted to Network Administrator in the Administration Division.  (*Id.* at 27, 35, 37.)

*a. Baker's lay-off*

On or about January of 2005, Lawton informed Baker that his position had been eliminated due to consolidation and that he was being laid-off effective January 24, 2005.  (*Id.* at 48; Defs.' Mot. for Summ. J. as to Baker, Ex. K1-K2 [Baker Interrogs.] at No. 1.)  Baker was told that, per City policy, he could choose to either accept the lay-off, retire, or "bump" another employee—that is, take a demotion and displace a lower level employee.  (Baker Dep. at 49.)  Lawton told Baker that he had two weeks to make his decision.  (*Id.* at 50; Baker Interrogs. at No. 1.)  Baker elected to bump another employee and requested that he be placed in the position of LAN Administrator, one position below his then-current position.  (Baker Dep. at 50.)  Upon being informed that there was no one in that position to bump, Baker agreed to be demoted to the lower position of Network Support Specialist ("NSS"), displacing Rudolph Smith, an African-American male.  (*Id.* at 51.)  He declined to be bumped into an HR Rep position that would have paid him a higher salary than the NSS position.  (*Id.* at 57.)

According to Lawton, the City was planning to consolidate its Information Technology ("IT") and Public Relations departments.  (Defs.' Mot. for Summ. J. as to Baker, Ex. C [Deposition of Rachel Lawton] at 104.)  She contends that she was directed by the Mayor's Office to "lay off from the top and have people bumped down" into lower positions at the Commission.  (Lawton Dep. at 109).  Lawton contends that in a meeting with Joyce Wilkerson, then the Mayor's Chief of Staff, they discussed the fact that "there were two full-time people in IT at the agency, and that it was possible to possibly get along with one full-time IT [person] . . . .  So there was [a] recommendation to lay one person off in IT."  (Lawton Dep. at 106.)  The consolidation of the IT department never took place.  (Baker Interrogs. No. 2.)

24

After being bumped, Baker performed the NSS duties and was paid accordingly, but he also continued to perform much of the same work he did as a Network Administrator.  (Baker Dep. at 63.)  On Tuesday, March 29, 2005, Lawton asked Baker if he was still performing his "higher level duties," saying that it was important that he continue to do so.  (Baker Interrogs. at No. 2.)  She then stated that she was trying to get him paid at the "higher level," which he took to mean the LAN Administrator level and not the Network Administrator level.  (*Id.*)

Baker appealed his lay-off decision to the Civil Service Commission ("CSC"), which found that the lay-off was improper.  (Defs.' Mot. for Summ. J. as to Baker, Ex. F [CSC Lay-Off Appeal].)  The CSC noted that "[t]here was no serious effort by the [Commission] to investigate the impact of the layoff on the IT operations at the [Commission] prior to the layoff" and that Baker was placed "in the untenable position of performing not only the administrative job duties of the Network Administrator, but also the job duties of the [NSS] for significantly less pay."  (*Id.* at 3.)  The CSC noted, however, that it did not find that the layoff was done for "unethical" or "biased" reasons.  (*Id.*)

### b. Baker's reasons for believing he was laid off because of his race

Baker asserts that "from the time Ms. Lawton entered the position of assistant director in one way or another she was directing whether overtly or covertly animosity towards me . . . and I have never done anything to hurt her personally . . . so the only thing left for me [to believe] was that she was doing it to me because of my race or my gender . . . ."  (Baker Dep. at 65.)  He also points to "the way other folks were being treated in the agency" to support his contention that racism was a factor in his layoff.  (*Id.*)

A few days after Baker elected to take a demotion rather than be laid off, he received a call from Jackie Henry, who said that Lawton had offered to let him keep his office if he were to take an

HR Rep position.  (*Id.* at 90.)  He contends that this was because Lawton "wanted me to not do the computer piece. . . . [S]he wanted Rudolph Smith to be the LAN administrator [because] he was actually burning DVDs for her while he was on the job."  (*Id.*)  Smith is an African-American male. (*Id.* at 91.)

At around the time Baker was laid off, Jack Fingerman, a white employee working in a public relations role at the agency, was advised that he was being laid off.[3]  (*Id.* at 51–52.)  Baker was told that Fingerman was given more than two weeks to decide which option he wanted to exercise.  (*Id.* at 52.)  Baker also contends that Fingerman was given an opportunity to work temporarily for the City in another agency while he was pondering his options.  (*Id.* at 169–70.)  Baker contends that if he had been given more than two weeks to make his decision that he would have tried to transfer to another city agency as a Network Administrator or a LAN Administrator, rather than accept a demotion to NSS within the Commission.  (*Id.* at 52–53.)  Furthermore, Baker contends that Lawton announced in a Commissioner's meeting that she was trying to bring Fingerman back to the agency. (*Id.* at 170.)

In November of 2003, Baker was told by his supervisor Kenneth Mabe, a white male, to watch himself because "the first chance that Rachel has to get [him] or do [him], she's going to do that."  (*Id.* at 66.)  Around the same time, Lawton sent an email to Baker and Mabe reminding them that workers needed to get permission to work extra hours.  (*Id.*)  Baker had, for ten or twelve years prior to that, worked extra hours.  (*Id.* at 66–67.)  This was not time for which he was compensated. (*Id.* at 67.)  Baker also alleges that Lawton scrutinized his time closely.  (*Id.* at 93.)

---

[3] In addition to Baker and Fingerman, Vivian Gray (an African-American female) and My-Nyat Tran (an Asian-American female) were also laid off.  (Defs.' Statement of Undisputed Facts ¶ 8.)

On or about December 4, 2003, Jackie Henry, an African-American Human Relations Director and Baker's immediate supervisor, told him that Lawton showed her a document describing Baker's job duties and salary and asked if the Commission could get rid of him.  (*Id.* at 67–68.)  At another point, Lawton said to Baker,  "Alonza, everybody in the agency dislikes you."  (*Id.* at 68.)  Shortly thereafter, another employee told Baker that Lawton disliked him.  (*Id.* at 68.)  Baker also contends that Lawton and her staff failed to use a computer system that he helped develop for the agency.  (*Id.* at 194–99.)  Baker contends that the reluctance to use the system stemmed from the fact that he is African-American.  (*Id.* at 194–99; Baker Interrogs. at 21.c.)

### c. Baker's criminal case and termination

Starting in the fall of 2004, Baker, a Vietnam veteran, began to see Dr. Marie Elinor Schoppet for counseling at the VA Hospital.  (Baker Dep. at 98.)  One day, while getting ready for work, Baker noticed in one of his drawers a box which contained some explosives that a friend brought back to him from Vietnam as a souvenir.  (*Id.* at 116–17.)  Seeing the container, he felt that he had to get rid of the explosives.  (*Id.* at 116.)  At that time, he thought that he could use the explosives on Lawton.  (*Id.*)  When this thought came into his head, Baker's resolve to dispose of the explosives strengthened and he decided to seek out Schoppet's help.  (*Id.* at 119.)  He was concerned because he had read an article about a man who had problems with his job, became depressed, and killed himself and his family.  (*Id.* at 120–21.)

On or about July 19, 2005, Baker informed Schoppet about his thoughts and the explosives. (*Id.* at 119–21.)  Upon hearing this, Schoppet called the VA police.  (*Id.* at 122.)  Ultimately, the police came to Baker's home, seized the explosives, and placed him under arrest for reckless endangerment.  (*Id.* at 135–38.)

Subsequently, Baker was informed by the Commission that he was being suspended with an intent to dismiss.  (*Id.* at 144.)  He was permitted to speak about the events at a meeting which was attended by Lawton, Henry, Chair of the Commission James Allen, an attorney from the City's Law Department, and Baker's attorney.  (*Id.* at 145.)  After this meeting, Baker received a letter terminating his employment due to the alleged threats against Lawton.  (*Id.* at 147.)  Baker contends that retaliation for filing the present lawsuit is the real reason he was fired.  (*Id.* at 148.)

### 2. Legal Analysis

#### a. Baker's Title VII race discrimination claim

Baker claims that he was laid-off because of racial discrimination.  This claim is analyzed under the framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).

The Court finds that Baker has failed to make out a *prima facie* case because the circumstances of Baker's lay-off do not raise an inference of discriminatory action.  The substantial majority of the conduct Baker points to has nothing to do with race.  Statements to the effect that Lawton did not like Baker fail to implicate race in any way.  (Baker Dep. at 70.)  The admonition from Baker's supervisor that Baker should "watch his back" because the "first chance that [Lawton] has to get you or do you, she's going to do that" also has nothing to do with race, nor does Lawton's alleged statement to Henry that Lawton was seeking a way to get rid of Baker.  (Baker Dep. at 66–68.)  Baker's evidence that Lawton disliked him is insufficient to get to a jury absent some basis for concluding that her animosity was racially based.

A good deal of the other conduct Baker points to suggests an *absence* of racial discrimination.  The email Baker received reminding him of the Commission's policy on extra work hours was sent not only to Baker but also to Mabe, Baker's white supervisor.  Furthermore, Baker

contradicts his own claim that the lay-off was inspired by racial animosity by suggesting that Lawton "wanted Rudolph Smith to be the LAN administrator" because Smith "was actually burning DVDs for her while he was on the job." (Baker Dep. at 90–91.) Smith, like Baker, is an African-American male.

The only evidence Baker points to that implicates race in any fashion is his allegation that Fingerman was given more time than Baker to weigh his options after being laid-off. (Baker Dep. at 51–52.) This minor distinction, even if true, obfuscates the fact that the January 2005 lay-off affected white, black, Asian-American, male and female employees, suggesting that no inference of unlawful discrimination can be drawn.

Even if Baker could make out a *prima facie* case of discrimination, Defendants would still be entitled to summary judgment with respect to the decision to lay Baker off in January 2005. Defendants proffer a legitimate, non-discriminatory reason for the lay-off: namely, that the Commission was directed by the Mayor's office to "lay one person off in IT" and "lay off from the top and have people bumped down." (Lawton Dep. at 106, 109.) Defendants submit evidence suggesting that lay-off decisions were made with cost-cutting in mind and that therefore higher paid employees and those who supervised few employees were targeted. Therefore, under the *McDonnell Douglas* framework, Baker would have to produce sufficient evidence such that the trier of fact could reasonably disbelieve the employer's proffered non-discriminatory reasons or believe that invidious discrimination more likely caused the action. *See Simpson v. Kay Jewelers*, 142 F.3d 639, 644 (3d Cir. 1998). Baker has failed to come forward with evidence discrediting the Commission's non-discriminatory rationale for the lay-off. As noted above, the majority of the conduct Baker points to does not implicate race nor refute Defendants' contention that the decision to lay Baker off

was made upon the direction of the Mayor's office.  The fact that Lawton allegedly showed Baker's job description and salary to Jackie Henry and asked if there was a way to get rid of him in fact buttresses Defendants' allegations that cost-cutting motivated the decision and does not suggest pretext.  Simply put, Baker does not present sufficient evidence such that a reasonable finder of fact could disbelieve Defendants' proffered non-discriminatory reasons for their decision.

### b. Baker's Title VII retaliation claim

Baker suggests that he was fired in retaliation for filing the present lawsuit.  Because he fails to show a causal link between his filing of the lawsuit and his firing, the Court will grant summary judgment on this issue to Defendants.

The record clearly shows that Baker was fired because he considered blowing Lawton up with explosives in his possession and not because of his conduct opposing purported discrimination at the Commission.  His termination was more than six months after he initiated the present lawsuit, timing which is not "unusually suggestive" of retaliation.  *See Krouse v. Am. Sterilizer Co.*, 126 F.3d 494, 503–04 (3d Cir. 1997).  Nor does Baker point to other circumstantial indicia that the reason for his firing was retaliation, such as a pattern of antagonism against him following his initiation of the present lawsuit or inconsistent reasons given for his termination.  *See Abramson v. William Patterson Coll. of N.J.*, 260 F.3d 265, 288 (3d Cir. 2001).  No reasonable finder of fact could conclude that Baker was terminated for any reason other than his admission that he thought about using explosives in his possession to harm Lawton.

### E.    John H. McNeil, Jr.

#### 1. Facts

In July of 1987, John McNeil began working for the Commission in the position of HR Rep

Level I in the Community Relations department.  (Defs.' Mot for Summ. J. as to McNeil, Ex. A [Deposition of John McNeil, Jr.] at 14.)

In 1996, My-Nyat Tran, an Asian-American female was promoted to the position of Human Relations Supervisor ("HR Supervisor").  (*Id.* at 28–30.)  No vacancy notice was distributed, and McNeil only became aware of the opening after it had been filled.  (*Id.* at 29.)  In 1997, another HR Supervisor position in Community Relations became available.  (*Id.* at 38-39.)  McNeil took the promotional civil service examination and placed fourth.  (*Id.* at 40.)  The position was given to the top scorer, Vernon Anastacio, a white male.  (*Id.* at 39–40, 44.)  In September of 2002, another HR Supervisor position became available.  (McNeil Dep. at 46.)  Sonia Collazo, a Hispanic female, was appointed Acting HR Supervisor.  (McNeil Dep. at 46–47.)  In May of 2003, McNeil took the competitive civil service promotional examination and received the second highest score.  (McNeil Dep. at 16–19, 51–52.)  Woonkin Chin, an Asian American male, received the highest score.  (McNeil Dep. at 17.)  Patricia Coin, a white female, and Sonia Collazo also took the test.  (McNeil Dep. at 19.)  In May of 2003, McNeil was appointed permanently to the HR Supervisor position.  (McNeil Dep. at 16–17.)  McNeil works out of the North Philadelphia field office and supervises seven human relations representatives.  (McNeil Dep. at 7–8.)

When Lawton became Acting Executive Director in October 2003, she established a formal chain of command policy that she announced to the supervisors during a meeting.  (McNeil Dep. at 54-55.)  McNeil alleges that Lawton circumvented this policy by speaking to McNeil's subordinates about their work rather than to McNeil.  (McNeil Dep. at 55-56.)  Two white supervisors, Joseph Farley and Rosemary Branigan, informed McNeil that Lawton had never gone to their subordinate representatives directly. (McNeil Dep. at 57-59.)

31

McNeil testified in his deposition that there was an "aura of dissatisfaction" throughout his tenure at the Commission.  (McNeil Dep. at 60-61.)  In his role as a shop steward, he listened to employees' complaints about problems at the Commission, and most of the complainants believed their problem was because of their race.  (McNeil Dep. at 61.)

### 2. Legal Analysis

McNeil does not raise any individual claims, but joins his co-Plaintiffs in bringing a section 1983 claim against the City.  The Court will address this claim immediately below.

### F.      Plaintiffs' Section 1983 Discrimination Claim

To prevail against a municipality on a section 1983 claim, a plaintiff must prove that the municipality had in place a policy or custom that caused the deprivation of a constitutional right. *Monell v. New York City Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978).  One way to establish municipal liability—and the only such route taken by Plaintiffs—is to show that the action was taken by someone with final authority for making a decision on behalf of the municipality.  *See Pembaur v. City of Cincinnati*, 475 U.S. 469 (1986).  "[M]unicipal liability under § 1983 attaches where—and only where—a deliberate choice to follow a course of action is made from among various alternatives by the official or officials responsible for establishing final policy with respect to the subject matter in question."  *Id.* at 483.  A municipality cannot be made liable pursuant to the doctrine of *respondeat superior.  Monell*, 436 U.S. at 691.

In the Third Circuit an individual is a "policymaker" for § 1983 purposes if (1) as a matter of state law, the official is responsible for making policy *in the particular area* of municipal business in question; and (2) the official's authority to make policy in that area is *final and unreviewable*.  *Hill v. Borough of Kutztown*, 455 F.3d 225, 245–46 (3d Cir. 2006) (emphasis in original).

32

The determination of who has final decision-making authority is a question of state law. *Jett v. Dallas Indep. Sch. Dist.*, 491 U.S. 701, 737 (1989).  In making this determination, a district court must examine "state and local positive law, as well as 'custom or usage having the force of law.'" *Id.* (quoting *St. Louis v. Praprotnik*, 485 U.S. 112, 124 n.1 (1988)) (internal quotation marks omitted).  Such authority "may be granted directly by a legislative enactment or may be delegated by an official who possesses such authority." *Pembaur*, 475 U.S. at 483.  As the Supreme Court stated,

> When an official's discretionary decisions are constrained by policies not of that official's making, those policies, rather than the subordinate's departures from them, are the act of the municipality.  Similarly when a subordinate's decision is subject to review by the municipality's authorized policymakers, they have retained the authority to measure the official's conduct for conformance with *their* policies.

*Praprotnik*, 485 U.S. at 127.

In this case, Plaintiffs cite no Pennsylvania law supporting the contention that Lawton, as Deputy Director of Compliance or Acting Executive Director, had final policy making authority for the City.  Instead, they point to several acts allegedly conducted at Lawton's bequest to demonstrate her policymaking authority:  (1) her circulating an email stating the policy for Commission employees speaking to the media; (2) her role in reducing the number of vehicles at the Commission; (3) her role in Baker's lay-off; (4) her decision to order verbal counseling for Washington; (5) her decision to give Greenwood a warning for comments he made to a newspaper reporter; (6) the fact that she had to sign and approve all reports submitted by HR Reps; (7) her decision to deny Jenkins' request for a re-evaluation of his negative job performance report; and (8) her insistence that Farley meet with Jenkins weekly to provide him with a case-status report.  In addition, they note that the former Commission chairman, Reverend James Allen testified that the Commission's Executive

33

Director had the authority to discipline and fire employees, and that "under ordinary circumstances" the executive director, and not the commissioners, was responsible for disciplining and firing employees. (Greenwood's Statement of Undisputed or Disputed Material Facts and Br. in Resp. to Defs.' Motion for Summ. J., Ex. E [Deposition of James Allen] at 12–13.)

These acts are not sufficient to render Lawton a policymaker with respect to the Commission's own human resources. To the extent that the Court can decipher a policy in Plaintiffs' allegations, it is that the Commission scrutinized African-American males more closely than other employees and subjected them to harsher treatment. While Lawton may have had some discretion in disciplining and firing employees, Plaintiffs have not established that she had final authority to make human resources policy for the Commission. Rather, the record suggests that Lawton's decisions were "subject to review by the municipality's authorized policymakers"—the nine commissioners who comprise the Commission. *See Praprotnik*, 485 U.S. at 127. Although Allen delegated to Lawton some authority to manage the Commission's workforce and generally deferred to her judgment on such issues, the buck ultimately stopped with him. For instance, Allen testified that he made the ultimate decision to fire Baker. (Allen Dep. at 68, 73–74.) Lawton indicated that the decision to lay-off Baker was made upon direction by the Office of the Mayor to lay off the top IT employee. (Lawton Dep. at 104–09.) Thus, even though Lawton exercised some authority in personnel matters at the Commission, her authority to make policy was neither final, nor unreviewable. *See Brennan*, 350 F.3d at 428 ("[I]f a municipal employee's decision is subject to review, even discretionary review, it is not final and that employee is therefore not a policymaker for purposes of imposing municipal liability under § 1983."). Therefore, Plaintiffs cannot show that any harm they may have suffered was the result of a policy or custom of the City and their section

1983 race discrimination and racially hostile work environment claim against the City cannot survive summary judgment.

### G.    Hostile Work Environment

Plaintiffs raised the issue of a hostile work environment in Count I of their Second Amended Complaint and though their subsequent claims do not explicitly use the words "hostile work environment," it appears that they premise their claims on such a theory.

A hostile work environment is one that is "permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993) (citing *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 65, 67 (1986) (internal quotation marks omitted)).  To establish a racially hostile work environment claim under Title VII, a plaintiff must demonstrate that:  (1) the employee suffered intentional discrimination because of his race; (2) the discrimination was severe or pervasive; (3) the discrimination detrimentally affected the plaintiff; (4) the discrimination would detrimentally affect a reasonable person of the same race in that position; and (5) the existence of respondeat superior liability.  *See Andrews v. City of Phila.*, 895 F.2d 1469, 1482 (3d Cir. 1990).  In determining the existence of a hostile work environment, a court must examine the "totality of the circumstances," rather than assessing each piece of evidence in isolation.  *Id.*  The Third Circuit has articulated several factors for courts to examine, including:  (1) the frequency of the discriminatory conduct; (2) its severity; (3) whether it is physically threatening or humiliating, or a mere offensive utterance; and (4) whether it unreasonably interferes with an employee's work performance.  *See Weston v. Pennsylvania*, 251 F.3d 420, 426 (3d Cir. 2001) (citing *Harris*, 510 U.S. at 23).

35

Plaintiffs "cannot sustain a claim simply by asserting an event and then asserting that it was motivated by racial bias." *Davis v. City of Newark*, 285 F. App'x 899, 902–03 (3d Cir. 2008). Most of the incidents of which Plaintiffs complain "implicate [Lawton's] personality, temperament, and the other various factors that tend to cause favor or disfavor between co-workers rather than racial issues." *Id.* at 903. The acts upon which Plaintiffs rely fail to demonstrate the existence of a hostile work environment. Jenkins alleges that white colleagues were not scrutinized in their comings and goings as much as he was, but he also admits that his black colleagues were not scrutinized either. (Jenkins Dep. at 49–54.) Baker alleges that Fingerman received more time to mull his options, but both were laid-off. McNeil and Greenwood claim that Lawton spoke directly to their subordinates and did not do so for white supervisors, but such talks are not sufficiently severe to constitute a racially hostile work environment. Greenwood complains that Lawton did not meet with him early in her tenure, but he admits that she did not seem to have a problem meeting with anyone other than him. The remainder of Plaintiffs' accusations relate to facially neutral conduct that does not suggest racial animus, like Washington being rebuked for hanging up on a caller, Greenwood being reprimanded for speaking to a journalist in violation of Commission policy, and McNeil not being promoted when others scored ahead of him on a promotion exam. Furthermore, Plaintiffs allege conduct that was not objectively threatening or humiliating—there was not even an offensive utterance.[4] The record indicates that when Plaintiffs received such scrutiny, it was attributable to Plaintiffs' work performance and not their race.

---

[4] Baker alleges that he witnessed white employees call a black female employee "a witch, almost call her a black B." (Baker Dep. at 193.) Aside from the ambiguity of this testimony and the uncertainty of the timing of the statement, this statement was directed against a *female* employee, whereas Plaintiffs claim in this suit that the discrimination was directed against African-American *males*.

36

Plaintiffs point to cases supporting the idea that a plaintiff can support his hostile work environment claim with evidence that he witnessed discrimination directed against a co-worker. *See, e.g.*, *West v. Phila. Elec. Co.*, 45 F.3d 744, 757 (3d Cir. 1995) ("In some instances, evidence of harassment of others will support a finding of discriminatory intent with regard to a later incident."); *Schwapp v. Town of Avon*, 118 F.3d 106, 111–12 (2d Cir. 1997).   While witnessing acts of discrimination might buttress a plaintiff's hostile work environment claim, witnessing facially neutral, non-discriminatory conduct cannot.   Simply amalgamating a series of conflicts between supervisors and employees into one lawsuit, without evidence that the conflicts were race-based, is not enough to establish the existence of a hostile work environment.

A reality of any work environment is that employees and their bosses will always have disagreements and conflicts.   Employees will think that the bosses treat them unfairly.   Bosses will think that their employees are not doing enough work or a good enough job.   This reality, coupled with the fact that an employee and a boss are of a different race, color, religion, sex, or national origin, does not on its own mean that discrimination is afoot.   Lawton may have been a difficult boss who did not like to have her authority challenged.   Farley may have had a paternalistic management style.   But an unpleasant work environment is not necessarily an unlawful racially hostile work environment.

## IV.   CONCLUSION

For the foregoing reasons, the Defendants' Motions for Summary Judgment are granted.   An appropriate order will be docketed separately.